Richard BANKS, Judy Banks, Roger McCarren, and Larry Meyer, Plaintiffs,

v.

Karen GALLAGHER, Anthony Mariano, William Stadnitski, and Dickson City Borough, Defendants.

Edward J. Kraft, Jr., Plaintiff,

v.

Karen Gallagher, Anthony Mariano, and Dickson City Borough, Defendants.

Civil Action No. 3:08–cv–1110.

United States District Court, M.D. Pennsylvania.

Nov. 17, 2009.

Robert J. Magee, Worth, Magee & Fisher, P.C., Allentown, PA, Johanna L. Gelb, Gelb Law Firm, Scranton, PA, for Plaintiffs.

Joseph F. McNulty, Jr., Post & Schell, P.C., Allentown, PA, for Defendants.

### MEMORANDUM

A. RICHARD CAPUTO, District Judge.

Presently before the Court are the Report and Recommendation ("R & R") of U.S. Magistrate Judge Mannion (Doc. 91), and Plaintiff Edward Kraft, Jr.'s Objections to the R & R (Doc. 95).[1] The R & R recommends that Kraft's Motion for Summary Judgment as to liability (Doc. 44) be denied. The R & R will be adopted, and the motion for summary judgment will be denied.

### BACKGROUND

On May 9, 2008 Edward Kraft, Jr. ("Kraft") was at the Old Country Buffet in Dickson City along with other members of the Pennsylvania Firearm Owners Association. (Kraft Dep. 7:20–8:3, Nov. 14, 2008.) The 911 dispatcher was contacted with a report that two (2) males with firearms on their sides were at the Old Country Buffet. (Gallagher Dep. 50:13–19, Nov. 11, 2008.) The caller stated that the males were not doing anything wrong, but that the caller "felt this was wrong with children running around and requested police to check on it." (Police Report, May 9, 2008, Doc. 50, Ex. 4.) At around 6:30 pm, Officers Karen Gallagher ("Gallagher") and Anthony Mariano ("Mariano") received the call to go to the Old County Buffet. (Gallagher Dep. 46:5–22.) At first, Mariano answered that they would not respond because no crime was being committed. (Mariano Dep. 10:10–19, Nov. 11, 2008.) After between one and a half to two minutes, they decided to take a ride down to check it out anyway. (*Id.* 11:7–18) Both officers were dressed in full police uniform. (Gallagher Dep. 48:3–19; Mariano Dep. 78:1–17.) Both arrived at the

1. Because the only issue presently before this Court is whether to grant Plaintiff Kraft's Motion for Summary Judgment, I need not address whether summary judgment is appropriate for the other plaintiffs or defendants at this time.

Old County Buffet in separate marked Dickson City patrol cars. (Gallagher Dep. 157:3–9.)

Upon arrival, there was a line of patrons extending out the door, and the restaurant was extremely packed. (Gallagher Dep. 82:21–25.) At that time there was no indication that anyone was drawing a firearm or threatening anyone. (Mariano Dep. 16:21–24.) Mariano and Gallagher did observe several males sitting at a table with firearms on their sides. (Gallagher Dep. 83:15–17.) They observed nothing else that was unusual or reasonably suspect, and did not feel that it was an emergency situation. (Mariano Dep. 88:5–13.) Mariano wanted to tell the group why the officers were there so he politely asked them to come outside to the vestibule to speak to him. (*Id.* 25:13–26:14.) At least one of the gun carrying group members simply chose to ignore the request of Mariano and continued to sit at the table. (Larry Meyer Dep., 14:4–7, Nov. 13, 2008.) Another group member was not present at the time Mariano spoke with the group, and after hearing of Mariano's presence he chose to walk to the vestibule. (Richard Banks Dep., 52:15–53:6, Nov. 13, 2008.) As the group went out, Mariano asked those who were carrying a concealed weapon to stand to his right while those with visible weapons should stand to his left. (Mariano Dep. 29:7–16.) Mariano was dealing with the concealed weapons group, while other officers from outside Dickson City handled the open carry group. (*Id.* 57:20–24.) Some of the men handed Mariano their driver's licenses or concealed weapons permits. (Mariano Dep. 50:3–23.) Gallagher ran the information from the driver's licenses through the communications center for identification purposes. (Gallagher Dep. 110:23–111:4.) Gallagher and Mariano also took the serial numbers off a few firearms. (*Id.* 114:15–24.) At some point, the group left the

vestibule area and went outside under the overhang. (*Id.* 169:22–170:4.) It had started to drizzle as they went outside. (Mariano Dep. 94:21–24.) Plaintiff Judy Banks was video taping the occurrence and following the taping she left the vestibule and returned to her table. (Judy Banks Dep. 27:8–28:19, Nov. 13, 2008.)

At around the time Mariano went with the group outside, Gallagher saw Kraft in a booth with a firearm on his side. (Gallagher Dep. 84:8–17.) Gallagher asserts that she asked Kraft to walk out with the others and that he voluntarily did so. (*Id.* 84:20–23.) Kraft asserts that Gallagher demanded that he walk out. (Kraft Dep. 21:17–22:2.) Kraft also asserts that Gallagher demanded that he give her his driver's license. (*Id.* 51:13–21.) Gallagher asserts that she asked Mr. Kraft for his identification to carry a firearm. (Gallagher Dep. 171:12–19.) Kraft asserts that Gallagher demanded he produce his concealed weapons permit even though he was not carrying a concealed weapon. (Kraft Dep. 47:18–48:19.) Gallagher does not remember if Kraft asked her whether she was "asking" or "demanding" that he provide his information. (Gallagher Dep. 171:20–24.)

Police Chief William Stadnitski ("Stadnitski") had never had an issue like this arise in his thirty-seven years of law enforcement in Dickson City. (Stadnitski Dep. 31:10–32:6, Nov. 11, 2008.) By the time Chief Stadnitski learned about the incident, it was already finished. (*Id.* 24:17–22.) Chief Stadnitski never notified his officers prior to May 9, 2008, that it was lawful to carry a firearm in Pennsylvania (*Id.* 55:4–12.) Chief Stadnitski had occasional meetings with his officers, but did not address updates in the law. (*Id.* 55:13–21) Training was provided to new officers at the Borough level via one or two ride-along shifts with another officer.

(Gallagher Dep. 23:14–22.) Dickson City had a policies and procedures manual (Stadnitski Dep. 9:10–13), but Gallagher had never seen it. (Gallagher Dep. 36:18–24.) Mariano was also not aware of any handbook of procedures. (Mariano Dep. 63:15–18.) The Borough does require that its officers complete their state Act 120 training. (Stadnitski Dep. 22:13–16.)

On June 20, 2008, Kraft filed this suit against Gallagher, Mariano, and Dickson City. (Case No. 08–cv–1177, Doc. 1.) On August 19, 2008, Magistrate Judge Mannion granted a motion to consolidate Kraft's case with the action brought by the other plaintiffs. (Doc. 15.) Kraft filed a motion for summary judgment on June 13, 2009. (Doc. 44.) On August 9, 2009, Magistrate Judge Mannion filed his R & R recommending that Kraft's motion be denied. (Doc. 91.) Kraft objected to the entirety of the R & R on August 18, 2009. (Doc. 95.) Both parties have fully briefed the motion and the R & R objections, and the motion is ripe for disposition.

## LEGAL STANDARD

### I. Review of Report and Recommendation

 Where objections to a magistrate judge's report are filed, the Court must conduct a *de novo* review of the contested portions of the report, 28 U.S.C. § 636(b)(1)(C), *Sample v. Diecks*, 885 F.2d 1099, 1106 n. 3 (3d Cir.1989), provided the objections are both timely and specific, *Goney v. Clark*, 749 F.2d 5, 6–7 (3d Cir. 1984). In its *de novo* review, the Court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. 28 U.S.C. § 636(b)(1)(C); *Owens v. Beard*, 829 F.Supp. 736, 738 (M.D.Pa.1993) (McClure, J.). Although the review is *de novo*, the statute permits the Court to rely on the recommendations of the Magistrate Judge to the extent it deems proper. *See United States v. Raddatz*, 447 U.S. 667, 675–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations"); *Goney*, 749 F.2d at 6–7; *Ball v. U.S. Parole Comm'n*, 849 F.Supp. 328, 330 (M.D.Pa.1994) (Kosik, J.). Uncontested portions of the report may be reviewed at a standard determined by the district court. *See Thomas v. Arn*, 474 U.S. 140, 154, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (the statute neither prevents nor requires a particular standard if no objections are filed); *Goney*, 749 F.2d at 7. At the very least, the Court should review uncontested portions for clear error. *See, e.g., Cruz v. Chater*, 990 F.Supp. 375, 376–77 (M.D.Pa.1998) (Vanaskie, J.) (citing Advisory Committee notes on Federal Rule of Civil Procedure 72(b), implementing 28 U.S.C. § 636(b)(1)(C)).

### II. Motion for Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue

of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DISCUSSION

Kraft argues that summary judgment is appropriate against all Defendants on each of the three counts in his complaint. At Count I, Kraft alleges a cause of action under § 1983 against Defendants Gallagher and Mariano for violations of his Second, Fourth, and Fourteenth Amendment rights. At Count II, Kraft alleges a cause of action against Defendants Gallagher and Mariano for a § 1983 conspiracy or a civil conspiracy under Pennsylvania law. At Count III, Kraft alleges a cause of action against Defendant Dickson City Borough for failure to train or supervise its officers, resulting in constitutional harm. Each of these counts will be discussed separately, considering whether the facts presented create a genuine issue of material fact.

### I. Second Amendment (Count I)

The United States Constitution provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Recently, in *District of Columbia v. Heller,* 128 S.Ct. 2783 the Supreme Court held that the Second Amendment "guarantees the individual right to possess and carry weapons in case of confrontation." *Heller,* 128 S.Ct. at 2798. In *United States v. Cruikshank, Presser v. Illinois,* and *Miller v. Texas,* the Supreme Court held that the Second Amendment was applicable only to the federal government, not to the States. *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876); *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886); *Miller v. Texas,* 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812 (1894). In *Cruikshank,* the Supreme Court stated "[t]he Second Amendment states that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress." *Cruikshank,* 92 U.S. at 553. More recently, these holdings have been applied by District Courts here

in the Third Circuit. *Eckert v. Philadelphia*, 329 F.Supp. 845, 846 (E.D.Pa.1971) ("the only function of the Second Amendment is to prevent the federal government, and the federal government only, from infringing that right.") (citations omitted). While these Supreme Court decisions are dated, they nonetheless continue to carry precedential weight.

Kraft argues that the Supreme Court in *D.C. v. Heller*, —— U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), opened the door for the argument that the Second Amendment also applies to the States. The Supreme Court stated:

> With respect to *Cruikshank'*s continuing validity on incorporation [against the States], a question not presented by this case, we note that *Cruikshank* also said that the First Amendment did not apply against the States and did not engage in the sort of Fourteenth Amendment inquiry required by our later cases.

*Heller*, 128 S.Ct. at 2813 n. 23. Kraft also cites *Nordyke v. King*, 563 F.3d 439 (9th Cir.2009), where the Court of Appeals for the Ninth Circuit held that the Second Amendment is selectively incorporated against the States. Regardless of any persuasive arguments in this opinion, the Third Circuit Court of Appeals has made clear "even where a lower court's analytical position has merit, the obligation to follow applicable Supreme Court precedent is in no way abrogated." *United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 156 (3d Cir.2005) (citing *United States v. Singletary*, 268 F.3d 196, 205 (3d Cir.2001)). Furthermore, as the Third Circuit Court of Appeals quoted in *Extreme Associates:*

> even if there were merit to [the] argument that the Supreme Court's later decisions have somehow weakened the precedential value of the older case, we may not precipitate its decline. The Supreme Court itself has admonished

lower courts to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in subsequent decisions....

*Singletary*, 268 F.3d at 205, quoted in *Extreme Assocs.*, 431 F.3d at 156 (brackets omitted). Regardless of the dicta in *Heller* or the strength of the Ninth Circuit's argument that the Second Amendment will be selectively incorporated against the States through the Fourteenth Amendment, at present the holdings of *Cruikshank*, *Presser*, and *Miller* are still law. I am bound by this precedent, and therefore find that the Second Amendment is not applicable against Pennsylvania state officials. Therefore, Kraft cannot demonstrate as a matter of law that he is entitled to judgment against Pennsylvania officials Gallagher and Mariano. Kraft's motion for summary judgment on this issue will be denied.

## II. Fourth Amendment (Count I)

### A. Investigative Detention

Kraft next argues that summary judgment is appropriate for his § 1983 claim because of his detention by the Defendants. "To establish a claim under § 1983, a plaintiff must allege (1) a deprivation of a federally protected right, and (2) commission of the deprivation by one acting under color of state law." *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir.1997). In order to prevail on a unlawful detention claim under Section 1983, Plaintiffs must demonstrate evidence that: (1) a Fourth Amendment seizure occurred, and (2) the seizure was without probable cause. *Gavlock v. Deniker*, Civ. A. No. 4:04–CV–02447, 2005 WL 1273582, at *2 (M.D.Pa. May 27, 2005) (McClure, J.) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir.1988)).

A person has been seized, within the meaning of the Fourth Amendment, "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "[T]he protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.'" *I.N.S. v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). The controlling test is "whether the officer's words and actions would have conveyed that [the person was not free to leave] to a reasonable person." *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

Mere police questioning does not constitute seizure under Fourth Amendment. *Muehler v. Mena,* 544 U.S. 93, 100, 125 S.Ct. 1465, 161 L.Ed.2d 299 (U.S.2005). Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and ask for consent to search, provided they do not induce cooperation by coercive means. *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Illinois v. Lidster,* 540 U.S. 419, 425, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (quoting *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Factors to be considered in determining whether the consent was voluntary include characteristics of the person consenting (age, maturity, education, intelligence and experience), and the conditions under which the consent to search were given, including the officer's conduct, the number of officers present, and the duration, location, and time of the encounter. *United States v. Hernandez,* 76 F.Supp.2d 578, 581 (E.D.Pa.1999) (citing *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996)).

Kraft argues that the facts demonstrate a clear issue of seizure where a reasonable person would feel coerced into giving consent. He points to the presence of armed and uniformed officers, and the arrest of another of the open carry group members. The existence of these factors alone, however, was specifically rejected in *U.S. v. Drayton,* where the Supreme Court held that a reasonable person would feel free to terminate such an encounter. *Drayton,* 536 U.S. at 205–06, 122 S.Ct. 2105 (multiple officers, armed, in uniform, speaking with individuals after arresting one not coercive). There is also a genuine dispute between Kraft and the Defendant officers as to whether there was a "request" or a "demand" to speak with the officers. For example, Officer Mariano testified in his deposition that the other officers at the scene "did say that if you're not carrying a concealed weapon, if you want to go back inside the restaurant, you can go back inside the restaurant." (Mariano Dep., 59:14–18.) The exact language and phrasing used by Gallagher and Mariano is significant when determining whether Kraft consented to the Defendants' actions. Because there is a genuine issue of material fact in dispute over this language, summary judgment inappropriate. Kraft's motion for summary judgment on this issue will be denied.

B. Seizure of Identification and Firearm

Kraft also argues that the temporary seizure of his identification and fire-

arm were in violation of the Fourth Amendment. The applicable law and facts are similar to the issue of seizure of Kraft's person; again, essentially boiling down to whether the items were turned over consensually, or as a result of the demands of the Defendants. Consent to seize Kraft's identification and firearm would defeat his Fourth Amendment claims here as well. There is a genuine dispute of fact between the testimony of Gallagher, stating that she requested Kraft's identification (Gallagher Dep. 171:12–19), and Kraft, asserting that Gallagher demanded it (Kraft Dep. 51:13–21). There is a similar dispute between the parties whether Gallagher demanded to see Kraft's firearm. (Gallagher Dep. 175:6–11, 179:19–24.) In the light most favorable to the non-moving party, the Defendants, there are genuine issues of material fact as to consent. Because the issue of consent is material to the Fourth Amendment claims brought by Kraft, summary judgment is inappropriate. Kraft's motion for summary judgment on these issues will be denied.

### III. Fourteenth Amendment (Count I)

 Under the Fourteenth Amendment, Kraft argues only that his substantive due process rights were violated. (Doc. 46 at 20.) The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Gottlieb v. Laurel Highlands Sch. Dst.*, 272 F.3d 168, 172 (3d Cir.2001) (quotations omitted). Only state conduct that is "arbitrary, or conscience shocking, in a constitutional sense" rises to this level. *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). "[T]he constitutional concept of conscience-shocking duplicates no traditional category

of common-law fault ...." *Id.* at 848, 118 S.Ct. 1708. The pertinent inquiry is "'whether the force applied caused injuries so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Jones v. Witinski*, 931 F.Supp. 364 (M.D.Pa.1996) (quoting *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir.1987)).

 Kraft alleges that the Defendants took the following actions: detained him, interrupted his dinner, questioned him along with the other group members, briefly took his identification, briefly took his firearm, had him stand facing the wall while the gun was examined, and kept him outside in the rain. Even if these allegations would represent a violation of Kraft's Fourth Amendment rights, none of them rise to the level of "conscience shocking." Regardless, Kraft's consent to the aforementioned actions would also defeat any substantive due process claim, just as it would defeat his Fourth Amendment claims. *See supra* Part II. Because there are genuine issues of material fact as to Kraft's consent, summary judgment for Kraft is inappropriate. Kraft's motion for summary judgment on this issue will be denied.

### IV. Civil Conspiracy (Count II)

#### A. Section 1983 Conspiracy

 Kraft also alleges that Gallagher and Mariano conspired to violate his constitutional rights under § 1983. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of any federal right shall be liable to the party injured. 42 U.S.C. § 1983. In order to

establish a conspiracy claim against the Defendants pursuant to Section 1983, there is a requirement of "(1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right." *Williams v. Fedor*, 69 F.Supp.2d 649, 665 (M.D.Pa. 1999) (Vanaskie, J.), *aff'd* 211 F.3d 1263 (3d Cir.2000) (citing *Kerr v. Lyford*, 171 F.3d 330, 340 (5th Cir.1999)). Because Kraft cannot demonstrate that summary judgment is appropriate as to any of the underlying constitutional claims, it would be also inappropriate to grant summary judgment on the § 1983 conspiracy claims. Kraft's motion for summary judgment on this issue will be denied.

### B. Pennsylvania Law Civil Conspiracy

Kraft also alleges that Gallagher and Mariano conspired to violate his constitutional rights under Pennsylvania law. "To state a cause of action for civil conspiracy, the following elements are required: '(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" *Strickland v. University of Scranton*, 700 A.2d 979, 988 (Pa.Super.Ct.1997) (quoting *Smith v. Wagner*, 403 Pa.Super. 316, 588 A.2d 1308, 1311–12 (Pa.Super.Ct.1991)). Under Pennsylvania law, proof of malice or an intent to injure is essential to the proof of a conspiracy. *Id.* (citing *Williams v. Lead Industries Association*, 547 Pa. 224, 690 A.2d 169, 174 (1997)). While Kraft is correct that the conspiracy agreement may be proved through circumstantial evidence, that does not mean that the existence of some circumstantial evidence necessarily resolves all genuine issues of fact. *See Rumbaugh v. Beck*, 411 Pa.Super. 220, 601 A.2d 319 (Pa.Super.Ct.1991). In the light most favorable to the non-moving party, there is a question of material fact as to whether Gallagher and Mariano acted with malice or an intent to injure Kraft. Kraft acknowledges this factual dispute in his brief objecting to the R & R, stating "a jury *could* reasonable infer from Gallagher and Mariano's actions that they acted with a common purpose." (Doc. 96 at 18) (emphasis added). Because the agreement and intent are a key part of any claim of civil conspiracy, summary judgment is not appropriate. Kraft's motion for summary judgment on this issue will be denied.

### V. Failure to Train or Supervise (Count III)

For a municipality or other government entity to be liable under section 1983, a plaintiff must establish: (1) a deprivation of a constitutionally protected right; (2) resulting from a policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Policy is made by an official statement of a 'decisionmaker possessing final authority to establish municipal policy,' and custom can be shown by the presence of a course of conduct that 'is so well-settled and permanent as virtually to constitute law.'" *Chernavsky v. Twp. of Holmdel Police Dep't*, 136 Fed.Appx. 507, 509 (3d Cir.2005) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990)) (internal quotations omitted). A municipality's failure to properly train its employees and officers can constitute a "policy" that is actionable under section 1983 only when that failure amounts to a deliberate indifference to the rights of the impacted person. *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir.1997). This does not mean that liability for failure to train can be predicated solely upon a showing that a municipality's

employees could have been better trained or that additional training was available which would have reduce the overall risk of constitutional injury. *Canty v. City of Phila.*, 99 F.Supp.2d 576, 581 (E.D.Pa. 2000) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1029–30 (3d Cir. 1991)). Rather, there must be a deliberate or conscious choice by the municipality to not train its employees before it may be held liable under section 1983. *Reitz*, 125 F.3d at 145. Further, evidence of an isolated incident is not sufficient to show the existence of a custom or policy. *See, e.g., Jones by & Through Jones v. Berwick Area Sch. Dist.*, No. 94–1818, 1995 U.S. Dist. LEXIS 21164, at *8 (M.D.Pa. March 13, 1995); *see also Losch v. Borough of Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984) ("[a] policy cannot ordinarily be inferred from a single instance of illegality"). Isolated violations are not the persistent, often repeated, constant violations that constitute a custom or policy. *Jones*, 1995 U.S. Dist. LEXIS, at *8. In addition, there must be a direct causal link between the policy or custom and the alleged constitutional violation. *Chernavsky*, 136 Fed. Appx. at 509.

For a failure to train claim, as for a § 1983 conspiracy, the first element is proof than an underlying constitutional violation has occurred. Kraft cannot demonstrate as a matter of law that he is entitled to summary judgment on the underlying constitutional claims. In the light most favorable to the Defendants, there are genuine questions of material fact as to the Fourth Amendment claims. As the evidence provided by Kraft could only possibly demonstrate a violation of his Fourth Amendment rights, and there is insufficient evidence to prove such a violation as a matter of law, and summary judgment is inappropriate on the failure to train claim as well. Kraft's motion for summary judgment on this issue will be denied.

## CONCLUSION

For the reasons stated above, the recommendations of the Magistrate Judge in the R & R (Doc. 91) will be adopted. Plaintiff Kraft's Motion for Summary Judgment (Doc. 44) will be denied.

## *ORDER*

**NOW,** this *17th* day of November, 2009, **IT IS HEREBY ORDERED THAT:**

1. The Report and Recommendation (Doc. 91) is **ADOPTED.**

2. Plaintiff Kraft's Motion for Summary Judgment (Doc. 44) is **DENIED.**

3. The case is **RECOMMITTED** to Magistrate Judge Mannion for further proceedings.

## *REPORT AND RECOMMENDATION*[1]

MALACHY E. MANNION, United States Magistrate Judge.

### I. INTRODUCTION

On June 20, 2008, Plaintiff Edward J. Kraft, Jr. filed a three-count civil rights action[2] against police officer Karen Galla-

---

1. For the convenience of the reader of this document in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted. No endorsement of any provider of electronic resources is intended by the Court's practice of using hyperlinks.

2. Plaintiff Kraft originally brought a separate action: Complaint, *Kraft v. Gallagher*, 3:08–cv–1177, 2008 WL 7321233 (M.D.Pa. June 20,

2008), (Filing No. *1* ). Kraft's action was consolidated into the instant action by order of the Court. *See* Order, *Kraft v. Gallagher*, 3:08–cv–1177, 2008 WL 7321234 (Aug. 19, 2008), (Filing No. *11* ); Order, *Banks v. Gallagher*, 3:08–cv–1110 (Aug. 19, 2008), (Doc. No. *15* ). To be clear, Kraft's summary judgment motion, i.e., the instant motion in this the consolidated action, is organized about the

gher, police officer Anthony Mariano (with Gallagher, the "Individual Defendants"), and against Dickson City Borough (the "Borough," and collectively with the Individual Defendants, the "Defendants") in regard to an incident that occurred on or near the premises of the Old Country Buffet in Dickson City, Pennsylvania, on or about May 9, 2008.

Count I alleges that the Individual Defendants violated plaintiff Kraft's Second Amendment, Fourth Amendment, and Fourteenth Amendment rights. Count II alleges that the Individual Defendants engaged in a civil conspiracy to violate Kraft's Second, Fourth, and Fourteenth Amendment rights.[3] Finally, Count III alleges that the Borough failed to adequately and properly train and supervise the Individual Defendants in violation of Kraft's Second, Fourth, and Fourteenth Amendment rights. The gravamen of plaintiff's complaint is that although Kraft and others were lawfully on the Old Country Buffet premises and lawfully openly carrying guns, the Individual Defendants (allegedly) searched and seized Kraft and his property absent probable cause and absent reasonable suspicion in violation of Kraft's constitutional rights. In terms of relief, plaintiff's complaint seeks damages, punitive damages, interest, and attorney's fees and costs. *See* Complaint at 14, (Filing No. *1* ).

Pending before the Court is Kraft's motion for summary judgment.[4] He seeks summary judgment, as to liability only, against all defendants on all counts. (Doc. No. *44* at 5.)

Having considered the parties' filings, federal and state constitutional and statutory law, case law, and persuasive scholarly authority, the Court, for the reasons elaborated below, will **RECOMMEND:** (A) that summary judgment be **DENIED** on the Second Amendment claim against the Individual Defendants on Count I; (B) that summary judgment be **DENIED** on the Fourth Amendment claim against the Individual Defendants on Count I; (C) that summary judgment be **DENIED** on the Fourteenth Amendment claim against the Individual Defendants on Count I; (D) that summary judgment be **DENIED** on Count II (against the Individual Defendants); and (E) that summary judgment

complaint which he filed in the terminated action, 3:08–cv–1177, (Filing No. *1* ), not the amended complaint (filed, apparently, only on behalf of the other plaintiffs) in the active consolidated action. *See* Amended Complaint, *Banks v. Gallagher*, 3:08–cv1110, 2008 WL 7321223 (M.D.Pa. Sept. 2, 2008), (Doc. No. *26* ). Chief of Police Stadnitski does not appear on the caption of Kraft's complaint.

**3.** In the complaint, (Filing No. *1* ), Counts I and III are expressly asserted under *42 U.S.C. § 1983.* Count II alleges civil conspiracy, but does not state whether it is asserted under federal or state law. In subsequent briefing, Kraft asserted this claim both under Section 1983 and under state law. *See Doc. No. 58.*

**4.** Kraft's motion has been briefed. *See* Plaintiff's, Edward J. Kraft, Jr., Motion for Summary Judgment (the "Motion"), (Doc. No. *44* ); Plaintiff's, Edward J. Kraft, Jr., Short and Concise Statement of Material Facts Pursuant to L.R. 56.1 ("Plaintiff's Statement of Undisputed Fact"), (Doc. No. *45* ); Plaintiff's, Edward J. Kraft, Jr., Brief in Support of His Motion for Summary Judgment ("Opening Brief"), (Doc. No. *46* ); Defendants' Short and Concise Statement & Counterstatement in Opposition to Plaintiff Kraft's Motion for Summary Judgment ("Defendants' Statement of Undisputed Fact"), (Doc. No. *50* ); Defendants' Brief in Support of their Response in Opposition To Plaintiff Kraft's Motion for Summary Judgment ("Opposition Brief"), (Doc. No. *51* ); Plaintiff's, Edward J. Kraft, Jr., Reply Brief in Support of His Motion for Summary Judgment ("Reply Brief"), (Doc. No. *56* ). *See also* Order (July 20, 2009) (permitting supplemental briefing on Count II), (Doc. No. *55* ); Supplemental Opening Brief, (Doc. No. 58); Supplemental Response Brief, (Doc. No. *61* ).

be **DENIED** on Count III (against the Borough).

## II. FACTS AND PROCEDURAL BACKGROUND

The procedural posture of this case does not appear to be disputed, nor are many of the background facts. Where facts are disputed, the Court will draw all reasonable inferences from disputed facts in the light most favorable to the defendants, the nonmovants. *Conopco, Inc. v. United States*, 572 F.3d 162, 165–66 (3d Cir.2009).

On or about May 9, 2008, Kraft and others arrived at the Old Country Buffet in Dickson City. Kraft and others were openly carrying non-concealed firearms. Others were carrying concealed weapons. Several persons at the restaurant—patrons, employees, etc.—confronted by the unusual set of circumstances contacted the police. A police dispatcher contacted Dickson City Borough police officers Gallagher and Mariano, who were at that time ordering dinner at the 6 East Diner on Route 6. Mariano and Gallagher left the diner, traveled to the Old Country Buffet, and entered it.

They found several visibly armed individuals. Mariano asked them to come outside. Several persons left their tables and with the officers entered a vestibule. Mariano asked those persons carrying concealed weapons to stand on his right, and those persons carrying non-concealed weapons to stand on his left.

At about this time, Gallagher approached plaintiff Kraft. Kraft was sitting at a booth with an infant. Kraft had a firearm at his side. Gallagher asked Kraft if he had a concealed weapons permit. And then she asked him to step outside with the others in the vestibule. Kraft interpreted this request as a demand. Mariano asked the persons in the vestibule for information, identification (i.e., drivers licenses), and gun permits. Some persons complied. Other officers, from the Throop and Blakely police departments, arrived, and Mariano asked them to deal with the open carry group.

Gallagher asked Kraft for his drivers license and firearm. Kraft claims she demanded them. Kraft complied with the request. The license was run through the "comm center" for identification purposes. Gallagher took down the serial number on Kraft's firearm and ran it through a firearms database. Both items were returned to Kraft after a short period. At the time Gallagher asked Kraft to give her his gun, she also asked Kraft to face the wall.

On June 20, 2008, plaintiff Edward J. Kraft, Jr. filed this three-count civil rights action bringing claims against the Individual Defendants and the Borough. Subsequently, his suit was consolidated with another action brought by other persons at the Old Country Buffet that day. On June 13, 2009, Kraft filed the instant motion for summary judgment, seeking a determination as to liability only, against all defendants on all counts.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under gov-

erning substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Aetna Cas. & Sur. Co. v. Ericksen,* 903 F.Supp. 836, 838 (M.D.Pa.1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; see also *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates,* 482 F.3d 641, 647 (3d Cir.2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman,* 327 F.3d 229, 238 (3d Cir.2003); see also *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986)). However, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the nonmovant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir. 2007).[5]

## IV. ANALYSIS

Plaintiff asserts several claims and legal theories against each of the three defendants. This report and recommendation addresses each in turn.

### A. The Second Amendment Claim

The United States Constitution provides that "the right of the people to keep and bear Arms, shall not be infringed." *U.S. CONST. amend. II.* Recently, the Supreme Court of the United States explained that the meaning of the operative clause of the *Second Amendment, supra,* is that it "guarantees the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller,* No. 07–290, 554 U.S. ——, 128 S.Ct. 2783, 2798, 171 L.Ed.2d 637 (2008) (Scalia, J.), although the specific holding of *Heller* was that the right protected by the Second Amendment extends to an individual's right to hold and use handguns in the home against an *absolute* prohibition imposed by the federal government. *Id.* at 2822 (emphasis added); *see also id.* at 2808

---

5. If the nonmoving party has the burden of proof at trial, the party moving for summary judgment is not required to "support its motion with affidavits or other similar material *negating* the opponent's claim," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, in order to discharge this "initial responsibility." In this situation, the movant " 'show[s]'—that is, point[s] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

("In the famous fugitive-slave case of *Johnson v. Tompkins,* 13 F.Cas. 840, 850, 852 (C.C.Pa.1833), [Justice] Baldwin, sitting as a circuit judge, cited both the Second Amendment and the Pennsylvania analogue for his conclusion that a citizen has 'a right to carry arms in defen[s]e of his property or person, and to use them, if either were assailed with such force, numbers or violence as made it necessary for the protection or safety of either.' ").

In *Heller,* the proponents of the Second Amendment right contested the constitutionality of a number of provisions of the District of Columbia code which had the effect of barring gun ownership and possession, even in one's own home, even for the purpose of self-defense. Because the *Heller* plaintiffs (the appellants before the circuit court of appeals, and the respondents before the Supreme Court) contested District of Columbia code provisions, *Heller*—on its facts—only adjudicated the applicability of the Second Amendment in regard to restrictions on the individual right to keep and bear arms imposed by the Federal Government, i.e., the District of Columbia. *Id.* at 2813 n. 23. The question of whether the Second Amendment is incorporated by the Fourteenth Amendment against the States (including their municipalities, instrumentalities, agencies, and officers), i.e., the question which is of interest here, was not squarely presented on the facts of *Heller.*

In *dicta,* however, the *Heller* Court addressed the incorporation question.

> With respect to *Cruikshank's* [6] continuing validity on incorporation, a question not presented by this case, we note that *Cruikshank* also said that the First Amendment did not apply against the States and did not engage in the sort of Fourteenth Amendment inquiry required by our later cases. Our later decisions in *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886) and *Miller v. Texas,* 153 U.S. 535, 538, 14 S.Ct. 874, 38 L.Ed. 812 (1894), reaffirmed that the Second Amendment applies *only* to the Federal Government.

*Id.* at 2813 n. 23 (citation added) (emphasis added). Given that the view expressed above is *dicta,* albeit part of the majority opinion in *Heller,* it is not entirely clear if this Court is bound by it.[7] *If* this Court is

---

6. *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876).

7. *See Central Va. Cmty. College v. Katz,* 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated."); *Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (distinguishing *dicta* and holding in prior case); *id.* at 436 n. 1, 105 S.Ct. 844 (Stevens, J., concurring in the judgment) ("I do agree with the Court's observation that dictum is not binding in future cases."); *Cohens v. Va.,* 19 U.S. 264, 399–400, 6 Wheat. 264, 5 L.Ed. 257 (1821) (Marshall, C.J.) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."); *see also* Pierre N. Leval, *Judging Under the Constitution: Dicta about Dicta,* 81 N.Y.U. L. Rev. 1249, 1274 (2006) ("The Supreme Court's dicta are not [binding judge-made case] law. The issues so addressed [through *dicta*] remain unadjudicated."). *See generally* Edward A. Hartnett, *A Matter of Judgment, Not A Matter of Opinion,* 74 N.Y.U. L. Rev. 123 (1999) (arguing that binding precedent extends only to federal court judgments, and the factual basis of the adjudication, but not to the announced reasoning appearing even in majority opinions).

bound by the *Heller dicta, supra,* then that *dicta* forecloses any Second Amendment claim, including plaintiff's claim here, based on the incorporation of the Second Amendment against the States.

■■■ Still, even if this Court is not bound by the *Heller* dicta, this Court agrees with it. In *United States v. Cruikshank,* in *Presser v. Illinois,* and in *Miller v. Texas* (collectively the "pre-*Heller* Supreme Court case law"), the Supreme Court was squarely presented with the question of whether the Second Amendment applied to the States. In each case, the Supreme Court held that the Second Amendment did not apply to the States. *See Cruikshank,* 92 U.S. at 553 ("The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government . . . ."); *Presser,* 116 U.S. at 265, 6 S.Ct. 580 ("But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of congress and the national government, and not upon that of the state.") (citing *Cruikshank, supra*); *Miller,* 153 U.S. at 538, 14 S.Ct. 874 ("We have examined the record in vain, however, to find where the defendant was denied the benefit of any of these provisions, and, even if he were, it is well settled that the restrictions of the[ ] [Second and Fourth] amendments operate only upon the federal power, and have no reference whatever to proceedings in state courts.") (citing *Cruikshank, supra*).[8] Although these cases are dated,[9] i.e., from 1876, 1886, and 1894, they remain binding precedents of a higher court than this one. Indeed, the Supreme Court has explained that only it has the authority to overrule one of its prior precedents. "If a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Exp., Inc.,* 490 U.S. 477,

---

8. *Cruikshank* carries more persuasive force than *Presser* or *Miller.* Although *Cruikshank* is older than the latter two cases, the reasoning in *Presser* and *Miller* was in the alternative, i.e., the position that the Second Amendment did not apply to the States was only one ground among others for the Court's holding in each of those latter two cases. In *Cruikshank,* by contrast, the Court rejected one count of an indictment on the *exclusive* grounds that the Second Amendment did not apply to the States. As explained, *Cruikshank* carries more persuasive force than *Presser* or *Miller,* but the holdings of the latter two cases do not become nonbinding dicta merely because they are reasoned in the alternative. *See, e.g., MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 346 n. 4, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) ("[S]ince the Superior Court did not rest its holding on only one of its two stated reasons, it is appropriate to treat them as alternative bases of decision."); *Ohio v. Roberts,* 448 U.S. 56, 69

n. 10, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (discussing "dictum" and "alternative holdings" as different positions), *abrogated on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *U.S. Steel Corp. v. E.P.A.,* 444 U.S. 1035, 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980) (Rehnquist, J., dissenting from denial of certiorari) ("Apparently uncomfortable with this holding, EPA attempts to dismiss it as dicta. It clearly is not. It was an independent, alternative basis for the decision of the court below, no more dicta than its companion holding that EPA demonstrated good cause.") (citation omitted).

9. *See A.D. Bedell Wholesale Co. v. Philip Morris Inc.,* 263 F.3d 239, 252 (3d Cir.2001) (quoting *Cruikshank, supra,* approvingly, without any indication that its holding or analysis is moribund or mere *dicta* ).

484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (emphasis added); *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.") (reaffirming *Rodriguez, supra*); *United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 156 (3d Cir.2005) ("Our own cases steadfastly apply the *Agostini* doctrine. In fact, we [have] emphasized . . . that even where a lower court's analytical position has merit, the obligation to follow applicable Supreme Court precedent is in no way abrogated . . . .") (citations omitted).[10]

This Court's conclusion that plaintiff's Second Amendment claim is foreclosed by *Cruikshank* and its progeny depends on *Cruikshank*'s being "direct[ly] applic[able]" to the instant litigation. *Rodriguez*, 490 U.S. at 484, 109 S.Ct. 1917. It is not obvious that *Cruikshank* is directly applicable. Indeed, there is (or, at least, was at the time plaintiff filed his brief) a federal circuit split on that very issue. *Compare Nordyke v. King*, 563 F.3d 439 (9th Cir.2009) (O'Scannlain, J.) (holding that pre-*Heller* Supreme Court case law is not binding, and that the Second Amendment right is selectively incorporated against the States), *rehearing en banc granted, Order* (July 29, 2009) (Kozinski, C.J.),[11] *with Nat'l Rifle Ass'n of Am. v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009) (Easterbrook, J.) (holding that pre-*Heller* Supreme Court case law is binding, and that the Second Amendment does not apply to the States).

In *Nordyke, supra,* the Ninth Circuit took the position that pre-*Heller* Supreme Court case law foreclosed direct application of the Second Amendment to the States, *Nordyke*, 563 F.3d at 446 (citing, *e.g., Barron v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833)), and also foreclosed incorporating the Second

---

10. Of course, plaintiff is free to (further) litigate or to attempt to litigate his Second Amendment claim in the District Court (before an Article III judge by objections to this report and recommendation), in the United States Court of Appeals for the Third Circuit (by direct appeal), and, potentially, in the Supreme Court of the United States (through a further discretionary appeal). By making his Second Amendment claim here, in the District Court, he has taken the first required step to preserve this issue for further judicial review (although it appears that only the Supreme Court can grant him the relief he seeks under the Second Amendment). However, because relief under the Second Amendment claim is foreclosed in this forum (unless or until new learning comes from the Supreme Court), this Court does not address the merits of plaintiff's selective incorporation argument. Such an examination of the merits—where no relief is possible—would seem to be, at best, *dicta,* if not a forbidden advisory opinion. *See Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) *(per curiam)* (noting judicial duty "to avoid advisory opinions on abstract propositions of law").

11. The Ninth Circuit's order granting *en banc* review also provided that "The three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit." Order at 2. The *Nordyke* three-judge opinion is discussed in the remainder of this report and recommendation. It is quoted and cited as persuasive authority only, not as precedential authority.

As a result of the Ninth Circuit's order, it can no longer be said (as things now stand) that there is any circuit split among the federal appellate courts. *See* Professor Eugene Volokh, The Volokh Conspiracy, Ninth Circuit Will Rehear *Nordyke v. King* En Banc (July 29, 2009 6:34 p.m.) ("As is usual with decisions to take the case en banc, the order provides that 'The three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit.' This technically means that there's no longer a circuit split on the subject . . . ."), *available at* http://tinyurl.com/m86fu4 (last visited July 30, 2009).]

Amendment against the States via the Fourteenth Amendment's Privileges and Immunities Clause, *id.* (citing, *e.g., Slaughter–House Cases,* 83 U.S. (16 Wall.) 36 (1872)). The Ninth Circuit went on to explain that the pre-*Heller* Supreme Court case law did not address whether the Second Amendment should be selectively incorporated against the States via the Fourteenth Amendment's Due Process Clause. *Id.* at 447–49 (quoting *Heller,* 128 S.Ct. at 2813 n. 23 (noting that the Supreme Court "did not engage in the sort of Fourteenth Amendment inquiry required by [the Supreme Court's] later [due process] cases")). Because this selective incorporation argument had not been addressed in prior binding case law (of the Supreme Court or of the Ninth Circuit), the Ninth Circuit reasoned that this question (i.e., whether the Second Amendment is selectively incorporated against the States by application of the Due Process Clause) remained open. It proceeded to address it, and it determined that, in fact, the Second Amendment right is selectively incorporated against the States. *Id.* at 449–58.

By contrast, in *Nat'l Rifle Ass'n, supra,* the Seventh Circuit held that the facts of *Cruikshank* and the other pre-*Heller* Supreme Court cases were factually indistinguishable from the case it was addressing (and, in that sense, not unlike the instant litigation before this Court). Because the Supreme Court held in pre-*Heller* cases that the Second Amendment applies only to the federal government, and not to the States, lower federal courts are not free to examine the question of whether the Second Amendment applies to the States. The fact that the pre-*Heller* Supreme

Court case law never reached the legal question of whether the Second Amendment might be applied to the States under the doctrine of selective incorporation was, according to the Seventh Circuit, irrelevant to the analysis.[12] According to the Seventh Circuit, if the facts are indistinguishable, then the holding remains binding law even if the parties and the Court never addressed a particular legal argument, issue, or theory. *See Nat'l Rifle Ass'n,* 567 F.3d at 857–58.

The disagreement between the positions of the Seventh and Ninth Circuits is a disagreement as to what counts as precedential (or to the reach of precedent). For the Ninth Circuit a precedent does not extend further than the legal reasoning announced by a court (in this case the Supreme Court). For the Seventh Circuit, a precedent extends to all cases having indistinguishable facts without regard to the rationale put forward by the prior opinion. Each of these two approaches as to what constitutes binding precedent has substantial merit. Because it appears, as will be explained below, that the Third Circuit has addressed this question, i.e., in the Third Circuit precedent extends to the facts of a case and is not limited to the rationale offered in the opinion, this Court will adopt the substantive position of the Seventh Circuit: the Second Amendment is not (at least under current binding Supreme Court case law) selectively incorporated against the States. This precludes plaintiff's Second Amendment claim.

*What Counts As Precedent In The Third Circuit?* In *United States v. Extreme Assocs., Inc.,* 431 F.3d 150 (3d Cir. 2005) (Smith, J.), the government brought an indictment against the defendants for

---

**12.** As the Seventh Circuit explained, not only did the Supreme Court not address "selective incorporation" in *Cruikshank, Presser,* and *Miller,* but it could not have done so, as the doctrine of selective incorporation "had yet to be devised when those decisions [had been] rendered." *Nat'l Rifle Ass'n,* 567 F.3d at 857.

violating certain federal statutes criminalizing the distribution of obscene materials. The District Court dismissed the indictment on the grounds that the federal statutes at issue violated the privacy rights of defendants' customers under the Fifth Amendment doctrine of substantive due process. *Id.* at 151.

Neither the Supreme Court nor the Court of Appeals for the Third Circuit has considered a substantive due process challenge to the federal obscenity statutes by a vendor arguing that the laws place an unconstitutional burden, in the form of a complete ban on distribution, on an individual's fundamental right to possess and view what he pleases in his own home .... Therefore, contrary to the government's position, defendants' challenge is not precluded by [prior Third Circuit and Supreme Court case law finding the contested statutes constitutional].

*United States v. Extreme Assocs., Inc.*, 352 F.Supp.2d 578, 590 (W.D.Pa.2005) (Lancaster, J.), *rev'd,* 431 F.3d 150 (3d Cir.2005).

The Third Circuit reversed the District Court. *See Extreme Assocs.*, 431 F.3d at 151. The Third Circuit offered two reasons in the alternative. *First,* the Third Circuit explained that "[i]n the broadest and most obvious sense, the Supreme Court has explicitly and repeatedly ... upheld the constitutionality of federal statutes regulating obscenity." *Id.* at 156. *Second,* the Third Circuit explained that although prior Supreme Court case law addressing the constitutionality of federal statutes regulating obscene materials did not explicitly use the phrase "substantive due process," i.e., the specific line of argument made by defendants in *Extreme Assocs.*, those cases did adjudicate that issue in light "of the principles and precedents that, according to the District Court and

[defendants], should control this case." *Id.* at 157. Thus, the defendants' legal argument had in fact been addressed and rejected in prior binding case law. These two rationales were put forward in the alternative. *Id.* at 159 ("[T]he District Court's Order granting [defendants'] motion to dismiss the indictment ... deal with the same statutes upheld repeatedly by the Supreme Court."), *with id.* ("[T]he Supreme Court has analyzed and upheld the constitutionality of the federal statutes regulating the distribution of obscenity specifically in light of the Court's broader right-to-privacy [substantive due process] jurisprudence [i.e., the legal theory put forward by defendants]."). Each alternative rationale supported the Third Circuit's holding. *See supra note 8* (collecting authority that alternative lines of reasoning within an opinion are each precedential). However, the Third Circuit's first line of reasoning indicates that a higher court's decision remains binding precedent, if factually on-point, even if its reasoning does not address a particular line of argument, i.e., a legal argument, issue, or theory. In short, in the Third Circuit, the binding force of precedent extends to factually indistinguishable cases, without regard to the reasoning put forward in the opinion. Thus, the pre-*Heller* Supreme Court case law, *Cruikshank, Presser,* and *Miller,* remain binding authority, even if they did not address (and, indeed, could not have addressed [13]) plaintiff's selective incorporation argument.

Therefore, as a matter of Third Circuit law, it appears that the Second Amendment does not apply to the States and, as this Court cannot recommend any relief on Second Amendment grounds, this Court need not address the merits of plaintiff's selective incorporation argument, despite

---

13. *See supra* note 12.

the fact that it has not been specifically addressed by higher binding appellate authority. In these circumstances, analyzing the merits of plaintiff's Second Amendment selective incorporation claim would amount to a non-binding advisory opinion or, at best, dicta because no relief can be granted.[14]

## B. The Fourth Amendment Claim

 Unreasonable searches and seizures are prohibited by the Fourth Amendment. U.S. CONST. amend. IV. "The Fourth Amendment's requirement that searches and seizures be founded upon objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (quotation marks omitted). Where the encounter between the police and the person questioned is consensual in nature, i.e., a mere encounter, no Fourth Amendment claim arises. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Law enforcement officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in public places," putting questions to those "willing to listen," and "ask[ing] for identification" even absent any "basis for suspecting a particular individual." *United States v. Drayton*, 536 U.S. 194, 200, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Rather, the protections of the Fourth Amendment are triggered when an encounter loses its consensual nature. In other words, a Fourth Amendment seizure has occurred if an individual is "restrained" by an officer's use of "physical force or show of authority." *United States v. Smith*, 575 F.3d 308, 312 (3d Cir.2009) (quoting *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382). "To be clear, a sei-

zure 'requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority.' " *Id.* at 313 (quoting *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "[T]he test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547; see also *Commonwealth v. Wood*, 833 A.2d 740, 745 (Pa.Super.2003) ("[I]t is axiomatic that our courts discern whether a person has been seized by determining whether, under all the circumstances surrounding the incident at issue, a reasonable person would believe he was free to leave.") (quotation marks omitted).

 In reaching a determination as to whether an encounter is a search or seizure for Fourth Amendment purposes, one is "require[d] to consider[ ] ... all the circumstances surrounding the encounter." *Smith*, 575 F.3d at 312 (quoting *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382). Our case law looks to a variety of factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 313 (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870). Furthermore, "[a]ny inquiry into an alleged seizure *must* begin by determining when the seizure occurred." *Id.* at 312 (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir.2008)).

Kraft argues that the Individual Defendants violated his Fourth Amendment rights by: (A) subjecting him, that is

---

14. *See supra* note 10.

Kraft, to an investigative detention absent any reasonable and articulable suspicion that plaintiff was engaged in criminal activity; (B) seizing his identification, i.e., his drivers license; and (C) seizing his property, i.e., his firearm.

The parties' briefing largely disputes, not whether the officers' conduct was reasonable, and therefore the searches and seizures were permissible under Fourth Amendment law, but whether or not there was any search or seizure in the first instance.

### 1. Was Kraft Subjected To An Investigative Detention?

Plaintiff argues:

Mr. Kraft was subjected to an investigative detention from the moment Gallagher approached him at the table [of the restaurant] and told him she needed to take him outside. He interpreted that as a demand. She said she told him she was called [to the restaurant] for males with firearms, and *asked* him to walk out with the others. Mr. Kraft submits she had no reason to ask him to do this since all he was doing was eating dinner [while displaying a non-concealed weapon in a public place, alongside an infant]. Regardless, he was not free to disregard her. She was in full uniform. She had *asked* him for his concealed weapons permit though she had no reason to. The other group had [already] walked out with Mariano. Mr. Kraft was effectively seized at that time.

Opening Brief at 7–8 (citations to the record omitted) (emphasis added). These factual assertions in plaintiff's brief, even if supported in the record, are clearly an insufficient showing for summary judgment on the Fourth Amendment claim. As explained, a police officer may approach an individual and put questions to the individual on the basis of articulable suspicion, less than articulable suspicion, or on *no* basis at all. *Drayton*, 536 U.S. at 200–01, 122 S.Ct. 2105. The fact that Gallagher, even if arguably acting on a mistake of law, may have had no basis for her inquiry does not convert an otherwise voluntary encounter into a seizure. Likewise, Kraft's subjective understanding that he had been seized is clearly insufficient: the test for a seizure is an objective one. Furthermore, the language of the brief indicates that Gallagher "asked" for Kraft's cooperation, not that Gallagher ordered or demanded Kraft to comply. Given the chosen language of the brief, it would seem that summary judgment would not be appropriate on these facts. Indeed, the only fact put forward here supporting an objective determination that there had been a seizure is that Gallagher was in uniform. But that is clearly insufficient, or else every encounter between an officer in uniform and an individual would be a detention for Fourth Amendment purposes. That is not the law.

Plaintiff argues in the alternative:

Should there be any doubt if at that point [when Kraft was approached by Gallagher], there can be no doubt that once Mr. Kraft entered the vestibule, he was subjected to an investigative detention. The circumstances surrounding this part of the incident included:

• When Gallagher got into the vestibule, some of the men were handing Mariano their driver's license.

• Gallagher *asked* Mr. Kraft to produce his identification when he got into the vestibule.

• Mr. Kraft saw Gallagher arrest his friend, Mr. Banks, for not giving his ID.

• Mariano was speaking with everyone, trying to get information.

• Gallagher was actively involved in gathering information.

- While Gallagher was in the vestibule, someone handed her an ID.

- While in the vestibule, backup officers arrived. They were actively engaged in collecting paperwork and asking for identification.

- These officers were Officers Rapoch and Lubeck ([from the] Blakely [police department]) and Officers Kereckman and Ruddy ([from the] Throop [police department]).

Given these facts, a reasonable person would not believe Mr. Kraft was free to leave ... Indeed, Gallagher knew she was conducting an investigative detention.... [Gallagher] was demanding production of identification.

Opening Brief at 8–9 (citations to the record omitted). What Gallagher "knew," her subjective intent, is as irrelevant as plaintiff's subjective belief as to whether or not he was free to leave. The controlling test is "whether the officer's words and actions would have conveyed that [the person was not free to leave] to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547.

■ Interestingly, here too, the brief states that Gallagher "asked" Kraft for his identification, not that she "demanded" or "ordered" Kraft to produce it. The fact that Mariano and other officers were talking to other individuals and collecting information and identification is not telling: the presence of other officers is significant, if their presence is in some way "threatening." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. For example, if the several

officers in the vestibule surrounded Kraft [15] and blocked him from exiting, then that would be a factor indicating that a seizure had taken place. Moreover, an officers' requesting a person's identification, standing alone, even absent a basis for doing so, has been expressly approved as not constituting a Fourth Amendment search or seizure. *Drayton,* 536 U.S. at 201, 122 S.Ct. 2105. This is not to say that such a request might not in other circumstances constitute a seizure. A request for identification may constitute a seizure where the officer or officers: had physical contact with the person, or used direct language indicating that a failure to comply with the request would lead to an arrest, or used a threatening tone, or displayed their weapons [16] in a way which is novel or unusual for police officers in nonemergency situations. *Smith,* 575 F.3d at 313. Here the only fact put forward that supports an inference that Kraft was not free to leave is that "Kraft saw Gallagher arrest his friend, Mr. Banks, for not giving his ID." Opening Brief at 8 (citing the record). On the other hand, the Individual Defendants point to record evidence stating that Kraft was on express notice that he *could* leave. *See* Mariano Dep. at 58:11–16 ("I explained to some of them at the time they were just—we were having a mere encounter with them. Some of them didn't have to produce ID. If they wanted to go back inside, they could have went [sic] back in the restaurant. The failed to do so."); *id.* at 59:14–18 ("[The other officers] did say that if you're not carrying a

**15.** Kraft asserts in his Reply Brief that he was surrounded by the police officers. But no citation to the record is put forward. *See* Reply Brief at 5.

**16.** Assuming that plaintiff is suggesting that the mere presence of several trained police officers publicly carrying non-concealed firearms constitutes a "threatening presence," would it not also follow that the presence of

several private citizens lawfully carrying non-concealed firearms in a public place could constitute an equal "threat"? If this is so, would not that "threatening presence" form sufficient grounds for a police officer to find a reasonable suspicion that some criminal activity may be afoot? Such a finding would vitiate plaintiff's Fourth Amendment claim.

concealed weapon, if you want to go back inside the restaurant, you can go back inside the restaurant."). Defendants' evidence strongly suggests that Kraft—who was not carrying a concealed weapon, see Opening Brief at 10 n. 5—chose to remain in the vestibule for his own reasons and did not acquiesce in regard to any display of authority by the officers. Mariano's testimony appears to be enough to create a jury question in regard to this disputed material fact. It seems to follow that summary judgment would not be appropriate here.

### 2. Was Kraft's Identification Seized in Violation of the Fourth Amendment?

Kraft argues that Gallagher seized his driver's license. The factual basis of this claim appears to be coextensive with his claim that his person was seized. Did Kraft voluntarily comply with a request made in an encounter situation? [17] Or, did Kraft acquiesce in response to an (objective) show of authority by the Individual Defendants? This appears to be a disputed material fact. Both parties have record evidence supporting their position. *See* Section IV[B][1], *supra*. For this reason and the reasons elaborated above, *id.*, the Court will not recommend awarding summary judgment on this claim.

 Nevertheless, even if there had been a seizure for Fourth Amendment purposes, it appears to the Court that Gallagher had an articulable suspicion that criminal activity was afoot, at least one sufficient to justify the minimal intrusion at issue here. At the outset, the Court notes that whether or not an officer has an articulable suspicion is an objective test:

Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the police officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the police officer] to determine whether he thought that the facts constituted reasonable suspicion. Additionally, it must be noted that, because the Terry reasonable suspicion standard is a commonsensical proposition, courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.

*United States v. Foreman*, 369 F.3d 776, 781–82 (4th Cir.2004) (brackets and citations omitted). Thus Gallagher's subjective motivation or purpose for allegedly demanding Kraft's drivers license is not central to the Fourth Amendment inquiry. *See Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety–Division*, 411 F.3d 427, 440–41 (3d Cir.2005). Neither is Gallagher's personal verbal ability to articulate his reasons, either on the day of the incident or, subsequently, at his deposition. Likewise, Pennsylvania state law in regard to the open carry of non-concealed firearms is not central to the inquiry. *See United States v. Laville*, 480 F.3d 187, 192 (3d Cir.2007) (holding "the validity of an arrest under state law must never be confused or conflated with the [federal] Fourth Amendment concept of reasonableness, and that the validity of an arrest under state law is *at most a factor* that a court may consider in assessing the broader question of probable cause") (emphasis added).

Thus, the question here is not whether an individual in certain jurisdictions of

---

**17.** Defendants' exhibit five, a videotape of (some of) the incident in the vestibule, apparently supplied by plaintiffs to defendants in discovery, seems to show that Officer Mariano

asked, rather than demanded, that Kraft and others produce identification and, where applicable, concealed weapons permits. *See Doc. No. 53 & Doc. No. 59.*

Pennsylvania may legally openly carry firearms. It is not contested by the Individual Defendants (for the purposes of this Motion) that such conduct is legal. Rather, the question is whether a police officer has a reasonable suspicion, justifying a stop and a short-lived inspection of a person's driver license, when they are confronted by a significant number of people exercising their open carry rights in a novel or unexpected way, at an unexpected place and time. So novel in fact, that apparently several persons at the restaurant were sufficiently moved to independently call the police to the scene. *See United States v. Sokolow*, 490 U.S. 1, 12, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (Marshall, J., dissenting) ("The reasonable-suspicion standard is a derivation of the probable-cause command, applicable only to those brief detentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exigencies such as the need to stop ongoing crimes, to prevent imminent crimes, and to protect law enforcement officers in *highly charged situations.*") (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (emphasis added).

There is nothing novel about this result. There are any number of activities, legal in themselves, but taken collectively may pose risks and dangers (to the public and to officers on the scene) and, thereby generate a reasonable suspicion to justify what would otherwise be a Fourth Amendment invasion. *Cf. Fla. Retail Fed'n v. Att'y Gen.*, 576 F.Supp.2d 1281, 1292 (N.D.Fla.2008) (noting that a law requiring "a business [to] allow one gun does not mean it rationally can be required to allow an unlimited number"). The result might be different if the Second Amendment right to bear arms was constitutionalized against state actors under the Fourteenth Amendment. In that situation, it might be error to burden the (collective) exercise of the Second Amendment right by making it a factor in the Fourth Amendment reasonable suspicion analysis.

At this time, it appears that the Second Amendment right does not apply against the States. Until such a time, it would seem our Fourth Amendment analysis would allow state actors to consider the presence of multiple concealed and nonconcealed firearms in a public restaurant during business hours as odd, novel, indeed, suspicious, and a potentially dangerous situation, particularly where, as here, children are present, i.e., a situation that may need to be investigated and defused until such a time as the officers can determine the facts on the ground. If Gallagher had, in fact, "seized" Kraft's drivers license for Fourth Amendment purposes, the intrusion was minimal in extent, for a short duration, and based on objective facts known to the officers at the scene.

It might be argued that although the presence of multiple firearms was an objective fact at the scene, that objective fact is an insufficient foundation for any "reasonable suspicion" of criminal activity. Kraft's papers suggest otherwise. Plaintiff argued: "[Kraft] was not free to disregard [Gallagher's orders]. She was in full uniform. (Statement, ¶ 41) .... At the time, [Gallagher] was in police uniform. That included: ... [a] firearm, [and] magazines." Opening Brief at 7; Statement of Undisputed Fact ¶ 41. The Court thinks the gravamen of Kraft's argument is plain. Notwithstanding that it is legal for a police officer to be in uniform, a person might "reasonably" feel threatened by the officer's presence, particularly where armed. If Kraft could feel threatened in such circumstances, about a trained police officer, it stands to reason that patrons and employees at the Old Country Buffet could equally and reasonably feel that way about Kraft and any number of other persons

who just happened to be legally carrying concealed and non-concealed firearms. Likewise, Gallagher and Mariano could have reasonably concluded, in these circumstances, that Kraft posed a threat. It is a short step, indeed, from "posing a threat" to a reasonable suspicion. The fact that Kraft was not engaged in illegal activity does not make the inference unreasonable. It only makes it wrong, as determined after-the-fact. *See Illinois v. Wardlow,* 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people.").

### 3. Was Kraft's Firearm Seized In Violation of the Fourth Amendment?

Whether or not a seizure took place depends in part upon whether Gallagher demanded that Kraft turn over his weapon to her. Plaintiff's brief seems to acknowledge that whether or not Kraft voluntarily surrendered his gun to Gallagher is in dispute. Statement of Undisputed Fact, ¶ 84 & n. 8. Assuming without deciding that Gallagher "demanded" Kraft to turn over his firearm, the Court takes the view that that seizure of short duration was supported by a reasonable suspicion for the reasons discussed in the prior two sections of this report. *See Sections IV[B][1–2], supra.*

### C. The Fourteenth Amendment Claim

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." *U.S. CONST. amend. XIV,* § 1. Thus, the Due Process Clause protects certain, but not all, liberty and property interests. Plaintiff claims that both his protected liberty and property interests have been violated by the Individual Defendants. *See*

Opening Brief at 20 (asserting a due process violation by the Individual Defendants, but only a substantive due process violation, not a procedural due process violation).

 However, not every violation of a liberty or property interest by a government officer amounts to a Fourteenth Amendment substantive due process violation. Rather, the official's behavior must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Kaucher v. County of Bucks,* 455 F.3d 418, 425 (3d Cir.2006) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)); Opening Brief at 20 (quoting *Kaucher, supra*) (same). In a substantive due process claim, official conduct is sufficiently egregious only when it "violates the decencies of civilized conduct." *Lewis,* 523 U.S. at 846–47, 118 S.Ct. 1708 (internal citation omitted); *Kaucher,* 455 F.3d at 425. There is no definitive standard for "shocks the conscience," and the determination of whether conduct shocks the conscience entails an analysis of the facts in a particular case. *Kaucher,* 455 F.3d at 425–26; see also *Lewis,* 523 U.S. at 847, 118 S.Ct. 1708 ("[T]he measure of what is conscience shocking [ha]s no calibrated yard stick ...."); *Kaucher,* 455 F.3d at 426 ("The question of whether a given action 'shocks the conscience' has an 'elusive' quality to it.") (quoting *Estate of Smith v. Marasco,* 318 F.3d 497, 509 (3d Cir.2003)).

### 1. The Liberty Interest

Plaintiff's brief, at least that section discussing the Fourteenth Amendment claim, fails to specify precisely which of his liberty interests were violated by the Individual Defendants. Indeed, it has no cites to the record at all in this regard. That alone may be sufficient reason to reject the claim

under Rule 56. *See Fed.R.Civ.P. 56* (requiring movant to clarify what material fact is not in dispute). It appears that plaintiff's position is that the officers' actions amounted to an arrest or an investigatory detention; a restriction on Kraft's freedom of movement, a liberty interest. However, not every Fourth Amendment violation, even assuming there was one here, automatically, and without more, works a Fourteenth Amendment violation: the underlying violation must shock the conscience. *Kaucher,* 455 F.3d. at 425. Moreover, the brief fails to specify how long this restriction on plaintiff's freedom lasted and which actions taken by each of the Individual Defendants brought about the restriction on his freedom of movement. Without such detail, it is difficult at best to find that either of the Individual Defendant's conduct "shocked the judicial conscience." *See Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 285 (3d Cir.2004).

Finally, the Court notes two other reasons to reject summary judgment on these facts. First, it appears to the Court that the circumstances that confronted the officers upon their arrival at the Old Country Buffet were novel. It is the Court's view that it is not common for a large group of persons to carry weapons, including hand guns, into a restaurant open to the general public. The fact that officer Gallagher may have been flummoxed by the situation is hardly surprising.[18] Second, neither officer derived any benefit from the purported rights violation. There is no allegation of corrupt motives or self-dealing. *Id.* at 286. (Self-preservation, even if based on mistakes of fact or law, is not self-dealing

in any meaningful sense.) There is nothing in the record to suggest that the officers were attempting to do anything here but their job as they understood it.

It seems to follow that even if the conduct of either or both officers exceeded their legal authority, even if Kraft was acting within the law in carrying a weapon, Kraft has not established for the purpose of summary judgment that either of the Individual Defendants' actions shock the conscience.

### 2. The Property Interest

Here, Kraft argues that he had a Fourteenth Amendment "property interest in his firearm," Opening Brief at 22, which was violated when the Individual Defendants "took his gun and ran the serial number." *Id.* As evidentiary support the Opening Brief cites Statement of Undisputed Fact, ¶ 84. Paragraph 84 states: "Gallagher took the serial numbers off of a few of the firearms. Mr. Kraft disputes this. He says Gallagher demanded he give her his gun to run the serial numbers for her investigation." *Id.* ¶ 84 & n. 8. Plaintiff's brief seems to acknowledge that whether or not Kraft voluntarily surrendered his gun to Gallagher is in dispute. *Id.;* Opposition Brief at 18. The reasons elaborated above in regard to the (allegedly) wrongful seizure of Kraft apply equally well to the allegation that Kraft's gun was (allegedly) wrongfully seized. Furthermore, a vanilla Fourth Amendment violation, if there was one here, without more, does not establish conscience-shocking behavior. Plaintiff's brief fails to put forward details such as how long Kraft lost

18. Plaintiff argues that the officers acted with deliberate indifference to his rights because they had an opportunity to proceed deliberately. Opening Brief at 20–21. But plaintiff's papers do not establish a failure of deliberation, but only that the Individual Defendants did not rush to the Old Country Buffet the moment they were contacted by the dispatcher. All that establishes is that the officers were well-informed enough to understand that the situation as described to them was not an emergency. The fact that something is not an emergency does not mean it should not be investigated.

possession of his gun or what sort of conscience-shocking egregious overreach (if any) Gallagher engaged in, the result of which was that Kraft submitted to Gallagher's show of authority. Absent such detail, the Court cannot say on these facts that Gallagher's behavior exceeded the norms of civilized behavior. *Lewis*, 523 U.S. at 846–47, 118 S.Ct. 1708. Finally, the situation was novel and no corrupt motives are alleged. For all these reasons, the Fourteenth Amendment claim would seem to fail.

### D. Count II's Civil Conspiracy Claim

Count II of Kraft's complaint, (Filing No. *1* ), alleges that the Individual Defendants combined with themselves and/or with others and thereby engaged in a civil conspiracy in violation of plaintiff's Second, Fourth, and Fourteenth Amendment rights. Plaintiff's complaint does not specify what law should control the Court's determination as to whether defendants engaged in a civil conspiracy. In plaintiff's Supplemental Opening Brief, plaintiff argues that defendants violated both federal law (under Section 1983) and state civil conspiracy law. (Doc. No. *58; see also* Supplemental Response Brief, (Doc. No. *61* ).)

1. Civil Conspiracy Under Section 1983

"In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right. Unlike [a] § 1985(3) [conspiracy claim], a § 1983 conspiracy claim does not require that the conspiracy be motivated by invidious discrimination." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir.1999) (citations omitted); Supplemental Opening Brief at 3 (citing *Ridgewood, supra* ), (Doc. No. *58* ). Plaintiff argues that the underlying due process claim is the federally

protected right, and that Gallagher and Mariano, acting under the color of state law, "combined to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose." *Panayotides v. Rabenold*, 35 F.Supp.2d 411, 419 (E.D.Pa. 1999). "Further[more], agreement is the *sine qua non* of a conspiracy." *Id.* (quoting *Spencer v. Steinman*, 968 F.Supp. 1011, 1020 (E.D.Pa.1997)); Supplemental Opening Brief at 3 (citing *Panayotides, supra* ), (Doc. No. *58* ). To support his position, Kraft's brief, (Doc. No. *58* at 4), cites Plaintiff's Statement of Undisputed Fact, ¶¶ 39–40, 51–52, 56–71, which itself supports the asserted facts by citing to assorted attached depositions and exhibits. The Court has read each of the asserted statements of fact. Not one is evidence establishing or tending to establish that the Individual Defendants combined or agreed to anything, much less that they made an agreement to deny plaintiff any federal right.

For example, Kraft's brief states: "Gallagher and Mariano entered into the conspiracy when they got the call to go to Old Country Buffet. (Doc. 45, Statement, ¶¶ 39–40)." (Doc. No. *58*.) In turn, Plaintiff's Statement of Undisputed Fact states:

39. She [Gallagher] got the first call to go to Old Country Buffet at 6:29 p.m. (Exhibit 1, p. 46; Exhibit 2, Deposition Exhibit # 1).

40. At the time, she was at the 6 East Diner on Route 6, just ordering dinner, with Mariano. (Exhibit 1, pp. 47–48, p. 50).

Doc. No. *45* at 8. Even turning to the underlying exhibits and depositions cited by the Statement of Undisputed Fact, nothing therein established that the Individual Defendants agreed to do anything. Absent evidence in the record tending to establish agreement, summary judgment should not be granted.

Finally, because the Court has already rejected recommending summary judgment on the underlying claims—the Second Amendment, Fourth Amendment, and Fourteenth Amendment claims—it appears the Section 1983 conspiracy claim must also fail. "Section 1983 does not provide a cause of action for a conspiracy to deny due process [standing alone]; there must be an actual denial of due process before a [conspiracy] cause of action arises." *Hanna v. Home Ins. Co.*, 281 F.2d 298, 303 (5th Cir.1960); *see also Garner v. Twp. of Wrightstown*, 819 F.Supp. 435, 445 n. 7 (E.D.Pa.1993) ("Section 1983 does not create a cause of action *per se* for conspiracy to deprive one of a constitutional right. Without an actual deprivation, there can be no liability under Section 1983."), *Morley v. Philadelphia Police Dept.*, Civ. A. No. 03–880, 2004 WL 1527829 (E.D.Pa. July 7, 2004), *aff'd* 125 Fed.Appx. 457 (3d Cir.2005).

### 2. Civil Conspiracy Under State Law

The standard for civil conspiracy under Pennsylvania law is, in fact, a higher bar than under Section 1983. "To prove a civil conspiracy, it must be shown that two or more persons *combined or agreed* with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa.1979). To establish, the intent element of this count, plaintiff's brief asserts: "Gallagher and Mariano acted with a common purpose to deprive Mr. Kraft of his federal constitutional rights. (Doc. No. *45*, Statement, ¶¶ 56–71)." Doc. No. *58* at 4. Turning to paragraphs 56 to 71 of Plaintiff's Statement of Undisputed Fact, the Court finds no factual representations (supported by record evidence) supporting an inference that Gallagher or Mariano "combined or agreed" to any-

thing. At best, the representations within paragraphs 56 to 71 simply lay out the chronology of events at Old Country Buffet, ostensibly *after* the purported agreement had been reached at the time the Individual Defendants first set out in response to the dispatcher's call. Indeed, the events as described here lay out what appears to be the separate, and apparently uncoordinated, actions of the two Individual Defendants. Furthermore, the Court finds no factual representations supporting any inference that the Individual Defendants intended to injure plaintiff. Absent evidence in the record tending to establish agreement and tending to establish that the Individual Defendants intended to injure plaintiff, summary judgment should not be granted.

To put it another way, the gravamen of plaintiff's civil conspiracy claim is that an inference of agreement should be drawn because the Individual Defendants set out together in response to the dispatcher's call, arrived together, and proceeded to take action on their arrival at the Old Country Buffet. But no such inference of agreement can be drawn from these alleged facts. The Court notes, by way of analogy, that under Pennsylvania law, parallel conduct, even consciously parallel conduct, is "not sufficient to establish either a civil conspiracy or [a] concerted action" claim. *In re Asbestos School Litig.*, 46 F.3d 1284, 1292 (3d Cir.1994) (quoting *Fife v. Great Atlantic & Pacific Tea Co.*, 356 Pa. 265, 52 A.2d 24, 39 (1947)).

### E. Count III's Claim Against the Borough

Count III of the complaint alleges that the Borough failed to adequately and properly train and supervise the Individual Defendants who proceeded to violate plaintiff's Second, Fourth, and Fourteenth

Amendment rights. In consequence of those alleged rights violations, plaintiff asserts a Section 1983 claim against the municipality. *See* Opening Brief at 25 ("As a result [of the officers' conduct], the Borough violated Mr. Kraft's constitutional rights."). However, the only purported constitutional rights violation developed for summary judgment purposes was the Fourth Amendment claim. *Id.* at 23–24 (framing inquiry in terms of Individual Defendants' failure to understand "reasonable suspicion"); *id.* at 25 (mentioning only the "Fourth Amendment" right).

To bring a Section 1983 action against a municipality:

> [U]nder § 1983, a plaintiff must plead and prove that (1) an officer of a municipality, acting under color of law, deprived an individual of his constitutional rights; (2) the municipality had a "policy, practice or custom"; and (3) the municipality's implementation of that "policy, practice or custom" caused the officer to deprive the individual of his

constitutional rights. Thus, in order for the municipality to be liable under § 1983, the execution of a government policy or custom must inflict the injury and be the moving force behind the alleged constitutional violation.

*Curry v. Dover Police Dep't,* Civ. A. No. 04–175, 2005 WL 1385126, at *2 (D. Del. April 29, 2005) (Jordan, J.) (quoting *Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)) (emphasis added).[19] Here, the first element has not been established, i.e., the Court has already rejected recommending summary judgment on the underlying claims—purported violations of plaintiff's Second Amendment, Fourth Amendment, and Fourteenth Amendment rights.

Likewise, plaintiff has failed to establish the third element: causality. Plaintiff states in his brief that the "Borough did not provide its officers with any training." (Doc. No. *46* at 24.[20]) However, in plain-

---

**19.** The Third Circuit has explained, in the Fourteenth Amendment context, that:

> A finding of municipal liability does not depend automatically or necessarily on the liability of any police officer. Even if an officer's actions caused death or injury, he can only be liable under section 1983 and the Fourteenth Amendment if his conduct shocks the conscience. The fact that the officer's conduct may not meet that standard does not negate the injury suffered by the plaintiff as a result. If it can be shown that the plaintiff suffered that injury, *which amounts to deprivation of life or liberty, because* the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 .... *Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3d Cir.1994) (emphasis added); *see also S.M. v. Lakeland School Dist.,* 148 F.Supp.2d 542, 550 (M.D.Pa. 2001) (Vanaskie, J.) (same). In the instant litigation, the Court has not merely rejected the claim (for the purposes of its summary judgment recommendation) that the officers

were liable, but has rejected the legal claim (again, for summary judgment purposes) that there were any underlying rights violations.

**20.** Plaintiff's brief seems to acknowledge that the Individual Defendants had reasonable exposure to Fourth Amendment law.

> Gallagher knew the constitutional parameters she had to operate under. She got her Act 120 certification in October 2002; the training covered search and seizure law. She must attend 16 hours of mandatory in-service updates each year. Every year in the update manual there is a section on search and seizure. She attended in 2006 for 2005 ..... Mariano also completed his Act 120 training from February through July 2001. He was required to take training yearly. Each year, he was presented with an update on search and seizure law. Opening Brief at 11–12 (citations to the record omitted). This information seems to strongly undercut any claim that the Borough failed to educate, supervise, and train the Individual Defendants.

tiff's Statement of Undisputed Fact, plaintiff acknowledges that Pennsylvania municipal police officers must have "Act 120 certification." (Doc. No. 45 at 7.) Even if that requirement is not imposed by the Borough, the Borough can rely on the requirement of state law. Plaintiff's brief asserts that the "Borough does not have any additional training requirements." (Doc. No. 46 at 24.) But plaintiff's Statement of Undisputed Fact states that Act 120 certification requires "16–hour yearly updates." (Doc. No. 45 at 7.) Furthermore, even if the Borough had imposed no continuing education requirements, and even if none were imposed by state law, it does not follow that the Borough's alleged deliberate indifference caused the purported rights violation. If proper training in regard to Fourth Amendment law at the time of the officers' initial Act 120 certification would have led the officers to have made the same decisions as they made here, then improper training did not cause the purported wrongdoing.

A failure to train would have only caused the purported rights violation if subsequent developments in the law, and training therein, would have led the officers to have acted differently and in a way that did not violate plaintiff's Fourth Amendment rights. Plaintiff has put forward no such changes in controlling Fourth Amendment law and has made no such showing that the officers' behavior would have been different in any meaningful way in such circumstances. Thus, the Court recommends denying summary judgment on the municipal liability claim asserting a Fourth Amendment violation relating to failure to supervise and train.

## V. CONCLUSION

For the reasons elaborated above, **IT IS RECOMMENDED:** (A) that summary judgment be **DENIED** on the Second Amendment claim against the Individual Defendants on Count I; (B) that summary judgment be **DENIED** on the Fourth Amendment claim against the Individual Defendants on Count I; (C) that summary judgment be **DENIED** on the Fourteenth Amendment claim against the Individual Defendants on Count I; (D) that summary judgment be **DENIED** on Count II (against the Individual Defendants); and (E) that summary judgment be **DENIED** on Count III (against the Borough).

DATE: September 9, 2009.